Filed 1/28/25  People Protecting San Pedro Bluffs v. Coastal Commission CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| PEOPLE PROTECTING SAN PEDRO BLUFFS,<br><br>　　　Plaintiff and Appellant,<br><br>　　v.<br><br>CALIFORNIA COASTAL COMMISSION,<br><br>　　　Defendant and Respondent;<br><br>KRISHNA MURTHY, et al.,<br><br>　　　Real Parties in Interest and Respondents. | B332395<br><br>(Los Angeles County Super. Ct. No. 22STCP00530) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge. Affirmed.

Channel Law Group, Jamie T. Hall and Gregory T. Wittman for Plaintiff and Appellant.

Rob Bonta, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, Elizabeth St. John, Supervising Deputy Attorney General and Jackie K. Vu, Deputy Attorney General, for Defendant and Respondent California Coastal Commission.

Nossaman, Steven H. Kaufmann and Sara L. Johnson for Real Parties in Interest and Respondents Krishna Murthy, Nirmala Murthy, Raman S. Poola, and Vani Poola.

* * * * * *

A coalition of neighbors challenges orders of the California Coastal Commission (the Commission) that granted two coastal developmental permits authorizing two families to build two homes on two adjacent parcels atop an ocean bluff. The neighbors level a plethora of arguments at several aspects of the Commission's orders. Because these arguments all lack merit, we affirm the judgment denying the neighbors' writ petition.

## FACTS AND PROCEDURAL BACKGROUND

I. Facts

A. *The neighborhood*

West Paseo del Mar is a street in San Pedro, California, that runs along a south-facing bluff overlooking the Pacific Ocean from a height of approximately 115 feet. The bluff then slopes

gently toward the shore.  San Pedro is part of the City of Los Angeles (the City).

The stretch of West Paseo del Mar relevant to this case is lined on either side by homes, and is bookended by public parks that provide expansive views of the Pacific.  Most of the homes were built prior to 1976.  They represent an "eclectic" mélange of sizes and architectural styles.

There are 37 homes on the seaward side of West Paseo del Mar between the two parks.  The homes range in size from 378 to 3,410 square feet; the average is 1,637 square feet.  Nine of the seaward-side homes exceed 2,000 square feet; six exceed 2,500; and three exceed 3,000.  Five of the 37 homes have two stories.  It is not possible for a pedestrian to see the ocean from the sidewalk running in front of these 37 homes along West Paseo del Mar because the seaward view is blocked by buildings, fences, and/or vegetation.

Some of the homes across the street are larger than those on the seaward side, including one that is 4,405 square feet.

B.    *The projects*

During or before 2013, Raman and Vani Poola (the Poolas) bought the parcel of property at 1305 West Paseo del Mar (the 1305 parcel), and Krishna and Nirmala Murthy (the Murthys) bought the parcel next door at 1307 West Paseo del Mar (the 1307 parcel) (collectively, the homeowners).  Both parcels are on the seaward side of the street.

The 1305 parcel is a 19,293-square-foot vacant lot.  The Poolas seek to build a two-story, 3,695-square-foot single-family home with a 760-square-foot detached garage and a 1,154-square-foot rooftop deck.

The 1307 parcel is an 18,834-square-foot lot that currently has a 1,302-square-foot single-family home on it. The Murthys seek to demolish the existing home and build a two-story, 3,548-square-foot single-family home with a 665-square-foot garage and a 1,124-square-foot rooftop deck.

The Poolas and Murthys retained the same architect, so their projects share some commonalities. Each planned home will not exceed the pertinent 26-foot height limit set by San Pedro; to not exceed this limit, the foundation of each home is to be sunk at most three feet below the current topography. The seaward edge of each planned home's footprint will be set back 50 feet from the bluff's edge, which is itself 130 feet from West Paseo del Mar. At the seaward edge of each home (that is, 50 feet from the bluff's edge), and to provide lateral stability, the Poolas and the Murthys will each sink three, 70-foot-long soldier piles, each with a diameter of four and one-half feet, and will connect those soldier poles with a 36-foot long and four-foot wide grade beam. Each parcel will also have a six-foot tall wall along its border with West Paseo del Mar "that will prevent any views of the ocean from the public on W[est] Paseo del Mar."

C. **Coastal development permits**

1. *Before the City*

In 2013, the homeowners applied to the City for coastal developmental permits to construct their projects.[1] Following hearings in February 2017 and May 2018, the City's zoning administrator approved the permits in September 2018. After holding a public hearing in March 2019, the City's Harbor Area Planning Commission in May 2019 approved the zoning

---

[1] The homeowners initially sought to build larger homes, but revised their plans during the course of administrative review.

administrator's ruling and issued a letter approving the projects. The City thereafter issued a notice of final local action.

2. *Before the Commission*

People Protecting San Pedro Bluffs is a coalition formed by 10 individuals who live along the pertinent stretch of West Paseo del Mar (the neighbors). The neighbors appealed the City's final local action to the Commission, and the Commission exerted jurisdiction—as an appeal from the City's action as well as directly (because the projects fall within the band of the Commission's "dual jurisdiction"). After the Commission's staff issued reports in May 2021 and December 2021, and after the Commission held a public hearing on December 15, 2021, the Commission voted 6-2 to issue a coastal development permit for the 1305 parcel and voted 7-1 to issue one for the 1307 parcel. The Commission's findings are discussed more fully below.

## II. Procedural Background

On February 14, 2022, the neighbors filed two verified petitions for writs of administrative mandamus, one to challenge each permit. After the trial court consolidated the two cases, the neighbors filed a single, amended writ petition. After a full round of briefing and a hearing, the trial court issued a 20-page order denying the consolidated writ. Following the entry of judgment, the neighbors appealed.

## DISCUSSION

The neighbors argue that the Commission violated the California Coastal Act of 1976 (the Coastal Act) (Pub. Resources Code, § 30000 et seq.)[2] by issuing coastal development permits to the homeowners. The neighbors claim that the permits violate

---

[2] All further statutory references are to the Public Resources Code unless otherwise indicated.

5

the Act's requirements that (1) projects be "visually compatible with the character of surrounding areas" (§ 30251); (2) projects "protect views to and along the ocean and scenic coastal areas" (*ibid.*); (3) projects do not "require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs" and do not "create" or "contribute" to "geologic instability" (*id.*, § 30253, subd. (b)); and (4) the Commission consider a "[n]ew residential . . . development['s]" "significant adverse effects" "on coastal resources" "*cumulatively*" where that development is "located" outside "existing developed areas" (*id.*, § 30250, subd. (a), italics added).

Because these arguments come to us on appeal from the trial court's denial of a petition for a writ of administrative mandamus, our task is to assess whether the pertinent agency— here, the Commission—has committed a "prejudicial abuse of discretion," which exists when an agency "has not proceeded in a manner required by law" or the agency's findings are "not supported by the evidence." (Code. Civ. Proc., § 1094.5, subd. (b); *West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1518.) "As pertinent here, our task in reviewing the trial court's denial of the writ is to 'step into the trial court's shoes' and independently examine for ourselves whether the agency acted properly." (*Gooden v. County of Los Angeles* (2024) 106 Cal.App.5th 1, 14 (*Gooden*).)[3]

In examining whether the agency has proceeded in a manner required by law, we independently review any questions of law, including questions of statutory interpretation. (*John v.*

---

[3] Because our review focuses solely on the agency's decision, we have no occasion to address the neighbors' many criticisms of the *trial court's* decision.

*Superior Court* (2016) 63 Cal.4th 91, 95-96; *City of San Diego v. Board of Trustees of California State University* (2015) 61 Cal.4th 945, 956.) Although we independently examine the meaning of statutes, we may elect to accord some degree of deference to an agency's interpretation of a statute. (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 965 (*Reddell*); cf. *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1349 [no deference where agency "make[s] law" by altering the meaning of a statute].) Whether we will do so is "contextual" and "situational," although deference is more appropriate where the agency has "special familiarity with satellite legal and regulatory issues" arising under the statute at issue. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 11-12, italics omitted.)

In examining whether an agency's findings are supported by the evidence, we apply the substantial evidence standard, which "begin[s] with the presumption that the record contains evidence to sustain [those] findings of fact," "resolv[es] all conflicts in the evidence and draw[s] all inferences in support of [those findings]," and upholds findings if there is evidence that is "reasonable in nature, credible, and of solid value" sufficient that "a reasonable mind might accept [the evidence] as adequate" to support those findings. (*TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1370-1371; *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1057, 1058.)

The burden of showing a prejudicial abuse of discretion rests on the party challenging the agency's action. (*Gooden*, *supra*, 106 Cal.App.5th at p. 14.)

## I. The Coastal Act, Generally

The Coastal Act "govern[s] land use planning for the entire coastal zone of California." (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793 (*Pacific Palisades*).) The "[c]oastal zone" encompasses the length of California's entire coastline, "extending seaward to the state's outer limit of jurisdiction . . . and extending inland generally 1,000 yards from the mean high tide line of the sea." (§ 30103, subd. (a).) The Coastal Act is to be "liberally construed to accomplish its purposes and objectives." (§ 30009; *Pacific Palisades*, at pp. 793-794.)

The Coastal Act generally requires "any person . . . wishing to perform or undertake any development in the coastal zone" to "obtain a coastal development permit" from the local government with jurisdiction over the pertinent parcel at issue; the Coastal Act may require obtaining a permit from the Commission, as well. (§§ 30600, 30600.5.) Where, as here, the local government does not have a "local coastal program" that has been certified by the Commission,[4] an applicant may obtain a coastal development permit in a two-step process: (1) the applicant applies to the local government, which in this instance is tasked with assessing whether the "proposed development is in conformity with" Chapter 3 of the Coastal Act (§ 30604, subd. (a) [Chapter 3 starts with section 30200]); and (2) if any "substantial issue exists as to conformity" with Chapter 3, the Commission will entertain a de

4 Although the City of San Pedro developed a land use plan, the City of Los Angeles of which it is a part never completed the implementation process, so the Commission has yet to certify a "local coastal program" covering this region. (See § 30108.6 [defining elements of a "local coastal program"].)

8

novo appeal from the local government's decision (§§ 30625, subd. (b)(1), 30602, 30621; *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569).[5] Where, as here also, the parcel of property is "within 300 feet of the top of the seaward face of any coastal bluff," that parcel falls within the Commission's so-called "dual jurisdiction" and the applicant must obtain an additional coastal development permit directly from the Commission. (§ 30601, subd. (2); Cal. Code Regs., tit. 14, § 13301; *Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.)

## II. Visual Compatibility with the Character of the Surrounding Area

### A. *Pertinent facts*

In evaluating whether the projects are visually compatible with the character of the surrounding area, the Commission noted that "none of the policies [in the San Pedro land use plan] limit the size, mass, or scale of new development in the area," endorsed the City's findings that the projects are "relative in size and height to the surrounding properties," found that each project is "[]compatible" both with "the character of the smaller-sized homes in this neighborhood and in San Pedro," and found that "a mix of home sizes and architectural styles is compatible with San Pedro's eclectic character."

---

[5] Where, unlike here, a local government does have a certified local coastal program, the local government is tasked with assessing whether the development conforms to that program (§ 30604, subd. (b)), and the right to appeal to the Commission is more limited (§§ 30519, subd. (a), 30603).

9

**B.   *Analysis***

   1.   *Applicable standards*

Section 30251, which is part of Chapter 3 of the Coastal Act, requires that any proposed development "be visually compatible with the character of surrounding areas."  (§ 30251.)

Although the San Pedro land use plan sets a maximum height of 26 feet for residential development in designated coastal zones, the land use plan otherwise more generally expresses, in its Preamble and Objectives, that the "visual qualities of San Pedro [should] be protected as a resource of Community as well as regional importance," that any development should "be visually compatible with the character of the surrounding area," and that "the varied and distinctive residential neighborhoods and character of San Pedro" be "preserv[ed]."[6]

   2.   *Application*

The Commission's finding of visual compatibility is supported by substantial evidence.  By definition, "[a] decision on the compatibility of [a] project with the surrounding area is a subjective decision."  (*Reddell*, *supra*, 180 Cal.App.4th at p. 970.) However, the data regarding square footage and number of stories of the homes along West Paseo Del Mar, as well as the photographs of those homes, indicate a variegated hodgepodge of sizes and architectural styles.  Although the homeowners'

_____

[6]   The neighbors argue that the Commission erred in finding "none of the [applicable standards] limit the size, mass or scale of the new development in the area," but the Commission's summary of the pertinent standards was accurate:  Other than the height limit, there are no specific limits; instead, the Commission was to apply—and did apply—the more general limits on neighborhood compatibility.

10

proposed projects are, as the Commission noted, "larger than the average size of the homes in the area" and different from the nearby homes due to their slanted rooves,[7] the projects are nevertheless "generally consistent with the range of the size of homes in the area" as well as the "general character of the community" that is *itself* "a mix of home sizes and architectural styles."

        3.    *Neighbors' arguments*

The neighbors resist this conclusion with what boils down to four arguments.

First, the neighbors argue that the Commission's evaluation of the size and architectural style of the projects vis-à-vis homes in the surrounding neighborhood or area should be confined to only those homes along the seaward side of West Paseo del Mar, such that the Commission erred in considering the size of homes on the inland side of the street and in considering the architectural style of two homes located on a different street. For support, the neighbors point out that (1) the San Pedro land use plan requires "visual compatib[ility] with the character of the surrounding *area*," whereas section 30251 looks to the "surrounding *areas*," urging that this difference in language connotes a narrower focus under the San Pedro land use plan; and (2) a May 14, 2019 letter from the Commission's staff to the homeowners asked them to prepare a "visual streetscape analysis *of the bluff fronting homes* nearby the

---

[7] The Commission also noted that the proposed projects have seven-foot side yard setbacks. The neighbors contend that this is inaccurate, but the architectural diagrams in the record indicate that the seven-foot side yard setback is accurate as to the homes themselves (rather than the detached garages).

11

subject site" (italics added), urging that this request evinces the Commission's view that any analysis of compatibility should be confined to the homes on the seaward side of the street.

We disagree. To begin, we see no distinction between the San Pedro land use plan and the Coastal Act based upon the Coastal Act's use of "areas" because the Legislature's use of "the plural" in a statute includes "the singular." (§ 13.)[8] Significantly, neither the Coastal Act nor the San Pedro land use plan explicitly confines the analysis of size and architectural style to houses on the same side of the street. Further, the request of Commission staff for a streetscape analysis focused on the seaward side did not commit the Commission to focus solely on that side of the street. In any event, the Commission did focus the bulk of its analysis on how the projects fit (or did not fit) with the homes on the seaward side of the street, acknowledging that the projects were larger than the average home size on the seaward side and citing the home across the street solely as a further reference point. Even if we were to focus solely on the homes on the seaward side of the street, there are already two-story homes there and the square footage of the projects—3,548 and 3,695—is only slightly larger than the largest home (which is 3,410). The Commission acknowledged that the projects were just outside the size envelope of what currently exists, but a reasonable mind could still accept that the projects were within the general size and style of only the seaward-side homes. The Commission's

_____

8 Even if there were a distinction, the Coastal Act's ostensibly broader approach would control over the local government's uncertified land use plan because, as noted above, the Commission in this instance is obligated to enforce the Coastal Act. (Accord, *Martin v. California Coastal Commission* (2021) 66 Cal.App.5th 622, 633-634 (*Martin*) [so noting].)

12

inclusion of two homes in a different San Pedro neighborhood to illustrate the varied architectural styles was not inappropriate because, as noted above, the Commission focused primarily on the homes along West Paseo del Mar and also acknowledged that those two other homes were "beyond the immediate neighborhood."

Second, the neighbors contend that the Commission miscalculated the square footage of the projects by not including the size of their rooftop decks, and that the Commission on one occasion misreported the square footage of the house next door to the projects as 3,448 square feet when it was actually 3,201 square feet.  The Commission did not err in focusing on the square footage of the projects' residences without also including the rooftop decks, as there is nothing in the record to indicate that the Commission included any rooftop area when calculating the square footage of the other homes along West Paseo del Mar. And although the square footage of the house next door was incorrectly reported in the May 2019 staff report, that error was brought to the Commission's attention and corrected at the hearing—before any vote was taken.

Third, the neighbors assert that the Commission was unable to envision the architectural style of the projects from the two-dimensional elevation plans the homeowners submitted; according to the neighbors, the homeowners should have been required to produce an artist's rendering of what the projects will look like when completed.  Neither the Coastal Act nor the San Pedro land use plan requires a rendering, and this court is able to adequately picture based on the plans how the projects will look from the street.

Fourth and lastly, the neighbors assert that the Commission erred in ignoring that the two projects' similar architectural style, as well as their shared contiguous six-foot wall along West Paseo Del Mar, mean that the projects will together "look and feel" like one massive 9,000-square-foot "compound." We reject this argument, as the Commission could reasonably find from the submitted architectural drawings that the two projects' separate rooflines would not be viewed as a single "compound" despite sharing a common wall along the street.

## III. Impact on Scenic Views

### A. *Pertinent facts*

As noted above, the "views to the coast" along the "stretch of homes" on the seaward side of West Paseo del Mar between the two parks "are for the most part entirely blocked by" "the existing homes, fences, vegetation, and walls." The Commission found that, although the projects' erection of a six-foot wall along their border with West Paseo Del Mar "will not result in an improvement to public views of the coast, it also won't adversely impact any existing public views." The Commission further found that the two "public parks at either end" of the stretch have "public views and recreational opportunities to enjoy the ocean view," such that the "proposed project[s] would . . . not significantly affect the public coastal view opportunities in the area."

### B. *Analysis*

#### 1. *Applicable standards*

Section 30251 requires that any proposed development "be sited and designed" (1) "to protect views to and along the ocean

and scenic coastal areas" and (2) "in visually degraded areas," "to restore and enhance visual quality." (§ 30251)

The San Pedro land use plan has an objective, within its coastal zone, of "preserv[ing] existing scenic views of the ocean and harbor from designated Scenic Highways and scenic view sites." The land use plan also has policies of (1) "sit[ing] and design[ing]" "development" to "protect views to and along the ocean, harbor, and scenic coastal areas," (2) "prevent[ing] the blockage of existing views from designated public scenic view areas and Scenic Highways," (3) "provid[ing]" "[v]isual access to coastal views . . . by means of appropriately located . . . view spots," and (4) "protect[ing] public views to the ocean to the maximum extent feasible" for "development adjacent to a Scenic Highway" "[u]ntil a 'Corridor Plan' is prepared for a Scenic Highway.'" The land use plan even specifically provides that "[a]ll development seaward of the turn-out and viewsite areas of Paseo del Mar . . . be sited, designed and constructed so that public views to and along the ocean are protected to the maximum extent feasible."

### 2. Application

The Commission's finding that the projects will "protect" existing views of the ocean is supported by substantial evidence. Although the record does not set forth the precise height of the existing structures, walls and vegetation that presently block the view of the ocean along the pertinent stretch of West Paseo Del Mar, the photographs in the record support the Commission's finding that the mix of houses, walls and vegetation currently existing block that view. Because the projects' six-foot wall blocks the view to the same extent as the existing blockages, development of the projects protects and preserves *the existing*

15

*views* of the ocean.  What is more, the projects in no way undermine the effect of the unobstructed views of the ocean available from the public parks at either end of the stretch of residential homes along the bluff.

    3. *Neighbors' arguments*

The neighbors resist this conclusion with what can be distilled down into four arguments.

First, the neighbors offer up a series of photographs taken along West Paseo del Mar, from which they claim it is possible to see the ocean *over* the existing homes, walls and vegetation, and urge that the projects block *that* view.  We have examined those photos.  The Commission could reasonably conclude that the photos were taken from an elevation matching or exceeding the top of street signs and the rooftops of the structures in those photos, suggesting that the photos were taken from an atypical and elevated viewpoint.  We doubt that the Coastal Act and San Pedro land use plan were designed to preserve ocean views unavailable to anyone except those in such atypical and elevated viewpoints.  Further, surely a person from that viewpoint would also be able to see over the projects' six-foot walls.  In any event, the neighbors' photographs at best create a conflict in the evidence about the currently existing views, which the Commission was entitled to resolve in favor of the avalanche of other photographs indicating that pedestrians and passengers walking or traveling in vehicles cannot currently see the ocean from West Paseo del Mar.

Second, the neighbors urge that it is possible for the homeowners to *improve* the view of the ocean from West Paseo del Mar if they left unobstructed "view corridors" across their properties and also made their walls along West Paseo del Mar

16

see-through. The neighbors note that Commission staff, in May 2019 letters, urged the homeowners to consider such features as part of their plan. The neighbors' suggestion would effectively obligate the homeowners to *improve* the existing view of the ocean, yet the Coastal Act and San Pedro land use plan only obligate them to *protect* and *preserve* the existing view. The Commission's failure to go beyond what the law requires is not error. Further, the Commission's staff subsequently withdrew their request for the homeowners to consider these additional measures.

Third, the neighbors contend that, as a matter of statutory construction, the Coastal Act and San Pedro land use plan obligate the homeowners to *improve* the view of the ocean across their property. Specifically, the neighbors note that (1) the Coastal Act requires any development "to protect views to *and along* the ocean and scenic coastal areas," urging that the words "and along the ocean" cover a broader array of "views to . . . the ocean"; and (2) the San Pedro land use plan requires development to protect ocean views to the "maximum extent feasible." All of these provisions, however, are keyed to *protecting* ocean views. Creating a view to the ocean that does not currently exist is not *protecting* an ocean view; it is creating a new ocean view. Neither the Coastal Act nor the San Pedro land use plan so requires.

Fourth and lastly, the neighbors assert that the projects necessarily exist in a "visually degraded area" (because most of the 1970s homes along this stretch of West Paseo del Mar preexist the Coastal Act and its imposition of restrictions to protect ocean views), such that the projects are obligated to "restore and enhance visual quality" to the pre-Coastal Act level. (§ 30251.) The neighbors forfeited this argument by not raising it

17

before the trial court; although their opening brief to the trial court included the language regarding "visually degraded area[s]" whenever they quoted or paraphrased section 30251 as a whole, at no point did the neighbors argue that the area at issue *constituted* a visually degraded area. (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 63, fn. 27.) In any event, the neighbors' argument lacks merit because the presence of open and unobstructed views of the ocean from the parks bookending the stretch of homes at issue means that this area is not "visually degraded." Contrary to what the neighbors suggest, the Commission in evaluating how to address scenic views may consider the overall view, including views from areas off-site from the property being developed. (E.g., *La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 806-807, 815-817 [approving of "off-site mitigation" offered by the "dedication of a nearby undeveloped" beachfront parcel in lieu of mandating view corridors on the property being developed].)

## IV. Geologic Stability and Alteration of Natural Landforms

### A. *Soldier piles*

#### 1. *Pertinent facts*

The stability—and hence safety—of a slope is measured on a numerical scale, with a factor below 1.0 representing the failure of the slope and a factor of 1.5 representing the industry standard for safety. Dr. Joseph Street, one of the Commission's staff geologists, opined that the stability of the bluff beneath the location of the homeowners' proposed residences—when the seaward footprint of the residences stopped 50 feet from the bluff's edge—was a factor of 1.3 or 1.4. To bring that up to the

18

1.5 factor used as the industry standard for safety, the Commission obligated the homeowners to sink three 70-foot-deep soldier piles along the seaward edge of the residences' footprints and link the soldier piles together with a cross beam. Dr. Street opined that, although soldier piles can "in some situations, . . . act as protective devices that alter natural landforms," "the proposed soldier piles at the subject sites [in this case] would not, at least in the near term, act as 'protective devices' that significantly alter natural shoreline processes."

Dr. Street also studied the anticipated erosion of the bluff, including due to rising sea levels, on which the homeowners' properties sit over the 75-to-100-year design life of the proposed residences. Dr. Street opined that the bluff may retreat a maximum of 40 to 45 feet over that design life, and therefore recommended that the Commission condition the grant of the coastal development permits on the homeowners' submission of a "Removal Plan," "prior to issuance of [any] coastal development permit," that would provide for the removal of the soldier piles, the connecting beam, and potentially the residences themselves *before* erosion will expose the soldier piles and beam to view, thereby "ensur[ing] that protection of coastal resources is maximized and that coastal hazards are not exacerbated." The Commission adopted Dr. Street's recommendation and conditioned the grant of the coastal development permits on the submission and approval of such a plan, including a requirement that the plan mandate removal while there is sufficient area on the seaward side of the soldier piles "to place and/or operate construction equipment."

2.     *Analysis*

a.     Applicable standards

Section 30253, which is part of Chapter 3 of the Coastal Act, requires that "[n]ew development" (1) "[a]ssure stability and structural integrity," (2) "neither create nor contribute significantly to erosion, geologic instability, or destruction of the site or surrounding area," and (3) not "in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs." (§ 30253, subd. (b).)

The San Pedro land use plan has similar language. In geologically hazardous areas like the bluff on which West Paseo del Mar sits, development is permitted only if it "will neither create nor contribute significantly to erosion, geological instability or destructions of the site or surrounding properties."

b.     Application

Substantial evidence supports the Commission's finding that the projects, with the conditions placed on the issuance of the coastal development permits, will assure stability, not contribute to geologic instability, and in no way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs. The requirement that the homeowners install the soldier piles will assure geologic stability. Because the soldier piles are to be installed 50 feet inland of the bluff's edge, their installation will not "substantially alter natural landforms along [the] bluff[]." And because the issuance of the homeowners' coastal development permits is conditioned on submitting a plan for removing the soldier piles before they are exposed and while there is sufficient room on the seaward side of the soldier piles for the construction equipment necessary to remove them, the removal of the soldier piles will

20

also not "substantially alter natural landforms along [the] bluff[]." Dr. Street's expert opinion constitutes substantial evidence. (*Whaler's Village Club v. California Coastal Commission* (1985) 173 Cal.App.3d 240, 261 ["[o]pinion evidence of experts in . . . ecological sciences is a permissible basis for decision"]; *Anthony v. Snyder* (2004) 116 Cal.App.4th 643, 660-661 ["[a]n agency may . . . rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence"].)

c.     Neighbors' arguments

The neighbors resist this conclusion with what reduces to four arguments.

First, the neighbors argue that the Commission's findings are not supported by substantial evidence because Dr. Street's opinion is entitled to no weight. Specifically, they assert that Dr. Street's opinion that soldier piles are not "protective devices" unless and until a bluff is at imminent risk of geological collapse is (1) an inadmissible legal opinion, because the term "protective devices" is a legal term of art that can be defined by reference to a dictionary rather than through expert testimony, and (2) nonsensical, because a seatbelt is a protective device even if the passenger is not at imminent risk of a vehicular accident. To be sure, experts cannot offer opinions about the meaning of a statute, particularly when that opinion alters the statute's plain meaning. (E.g., *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841.) However, the neighbors' arguments are based on a misconstruction of Dr. Street's opinion. Regardless of whether snippets of Dr. Street's response to a question posed by one of the Commissioners at the hearing could be read to suggest that soldier piles are not protective devices *at all* unless stability is at

21

risk and there is something to protect, Dr. Street's ultimate opinion is that installation of the soldier piles on the homeowners' parcels will not require "the construction of protective devices *that would substantially alter natural landforms along [the] bluff[]*" in violation of section 30253, subdivision (b), because the soldier piles will be set back sufficiently far from the bluff's edge. Because the question of whether construction of the soldier piles will substantially alter natural landforms is a function of geological science (rather than aesthetics, as the neighbors contend), it is accordingly an appropriate topic for expert opinion testimony, as noted above. What is more, Dr. Street's opinion that soldier piles "in some situations[] can act as protective devices that alter natural landforms" (and thus violate the Coastal Act) is not, as the neighbors contend, evidence of inconsistency; instead, it is an acknowledgement that the validity of a project under the Coastal Act turns in part on whether the construction of those devices substantially alters the natural landforms.

Second, the neighbors contend that Dr. Street's opinion is entitled to no weight because his written report at one point states that the soldier piles would not act as protective devices "that significantly alter *natural shoreline processes*." (Italics added.) This italicized language, the neighbors contend, mimics the verbiage in section 30235, which specifies that "[r]evetments, breakwaters, groins, harbor channels, seawalls, cliff retaining walls, and other such construction that alters *natural shoreline processes* shall be permitted" under certain conditions, including "to protect existing structures . . . in danger from erosion." (§ 30235, italics added.) Thus, the neighbors conclude, Dr. Street's opinion rests on the wrong standard. We reject this argument. It

22

ignores that Dr. Street elsewhere opines that the soldier piles will not "alter natural landforms," which is the language that tracks section 30253, subdivision (b).  Even if Dr. Street in one passage borrowed language from a different statutory subsection dealing with erosion, the substance of his analysis and the verbiage he uses elsewhere make it reasonable for the Commission to resolve any confusion in favor of finding that Dr. Street was applying the correct statutory standard.

Third, the neighbors assert that Dr. Street had no basis for assuming that the design life of the homeowners' residences was 75 to 100 years.  However, Dr. Street explained the basis for this estimate as the age of the existing houses along West Paseo del Mar, with the oldest built in 1916, the next oldest in 1926, and the most recent in 2010.  This is an adequate evidentiary basis to support the factual premise of Dr. Street's opinion.

Fourth and finally, the neighbors challenge the Commission's decision requiring the homeowners to submit a plan for removal of the soldier piles should erosion create the possibility that the piles would become exposed to view.  The neighbors suggest that the requirement to submit a future plan is too vague, but this suggestion ignores that the homeowners must submit specific removal plans—and have them approved by the Commission's Executive Director—*before* the coastal development permits will issue.  The neighbors argue that the language set forth in the pertinent conditions—specifically, that the removal plans "ensure that protection of coastal resources is maximized and that coastal hazards are not exacerbated"—implies a balancing test that is inconsistent with section 30253, subdivision (b)'s more absolute mandate that protective devices not "substantially alter natural landforms along bluffs and cliffs."

23

But nothing in the language of the conditions alters the Commission's underlying finding that section 30253, subdivision (b)'s mandate is met *by having an approved plan*; the plans do not themselves have to incorporate section 30253, subdivision (b)'s mandate a second time. The neighbors contend that *no* plan can satisfy section 30253, subdivision (b)'s mandate because the removal of earth required to extract 70-foot-deep soldier piles will necessarily alter the bluff. But the applicable standard prohibits protective devices that "*substantially* alter the natural landforms along [the] bluff," and the Commission had a basis for concluding that removing the soldier piles long before they are exposed—by mandating removal while there is sufficient land on the seaward side of the soldier piles to accommodate construction equipment—means that any alteration will not be substantial. The neighbors finally urge that *Martin*, *supra*, 66 Cal.App.5th 622 supports their position. It does not. *Martin* held that substantial evidence supported the Commission's refusal to issue a coastal development permit where it was impossible to remove a proposed basement without destabilizing the bluff. (*Id.* at pp. 646-647.) Here, we are upholding as supported by substantial evidence the Commission's grant of permits after finding it is possible to remove the soldier piles without substantially altering the bluff.

### B. *Sunken foundation*

#### 1. *Pertinent facts*

The foundation of each residence will be placed at most three feet below the current elevation of the lot; this will require the removal of 751 cubic yards of soil from the 1307 parcel and 590 cubic yards of soil from the 1305 parcel.

2.      *Analysis*

a.      Applicable standards

As noted above and as pertinent here, section 30253 requires that "[n]ew development" not "in any way require the construction of protective devices that would substantially alter natural landforms along bluffs and cliffs." (§ 30253, subd. (b).)

b.      Application

Substantial evidence supports the Commission's implied finding that the removal of soil to accommodate the sunken foundations of the two residences will not substantially alter the natural landforms along the bluff. (The sunken foundations are also not protective devices.) The footprint of each residence stops 50 feet from the bluff's edge, so the properties will remain at the natural elevation along the bluff's entire seaward slope as well as along a substantial portion of the bluff's top.

c.      Neighbor's arguments

The neighbors offer two arguments. First, they contend that this case is just like the basement that the Commission refused to authorize in *Martin*, *supra*, 66 Cal.App.5th 622. They are wrong. The Commission in *Martin* refused to allow the building of a basement based on its finding that the basement in that case could not be removed without altering and potentially destabilizing the bluff. (*Id.* at pp. 646-647.) *Martin* focused on whether the destabilization violated the City of Encinitas's land use plan. (*Ibid.*) Here, substantial evidence supports the Commission's finding that the residences will not destabilize the bluff merely because a maximum of three feet of soil is removed along the footprint of the residence, and that this soil removal will not substantially alter the natural landform of the bluff. Second, the neighbors argue that the residences will—due to

25

erosion over time—be closer to the bluff's edge and, at that time, substantially alter the natural landform of the blufftop. However, the special condition requiring the removal of the soldier piles also mandates removal of the residences themselves if the soldier piles or cross-beams are in danger of exposure. Thus, there will not be substantial alteration due to the sunken foundation.

## V.    Cumulative Impacts

The neighbors lastly argue that the Commission violated section 30250, subdivision (a) by failing to explicitly consider the cumulative effect of past projects, other current projects, and future projects on the environment, including whether the precedent set by granting the coastal development permits for the homeowners in this case will set a bad precedent for future permit applications.  For support, they cite *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1338, 1358 (*Leonoff*), and *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 851-859 (*Hines*).

This argument is not well taken.

In full, subdivision (a) of section 30250 provides:

New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it *or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources.*

26

(§ 30250, subd. (a), italics added.) Under the statute's plain terms, an agency is charged with considering the "cumulative[]" "effect[]" "on coastal resources" only where the "[n]ew residential" "development" is to take place in areas that are not "located within, contiguous with, or in close proximity to[] existing developed areas." (*Ibid.*) Because the projects at issue here are to be built within the "existing developed area" of the West Paseo del Mar neighborhood, the cumulative effects analysis the neighbors demand is not required by section 30250, subdivision (a). And neither *Leonoff* nor *Hines* is helpful because they deal with cumulative effects analysis under the California Environmental Quality Act, not the Coastal Act.

\* \* \*

As an adjunct to nearly all of their challenges, the neighbors argue that the Commission violated our Supreme Court's mandate, set forth in *Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515, that an agency "must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." In affirming the Commission's ruling against each of the challenges the neighbors mount, we necessarily conclude that the Commission sufficiently bridged the gap between the evidence in the administrative record and the Commission's conclusions that the projects complied with the Coastal Act.

## DISPOSITION

The judgment is affirmed. The Commission and the homeowners are entitled to their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

27

_____, P. J.
HOFFSTADT

We concur:


_____, J.
BAKER


_____, J.
MOOR